NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**STRYKER CORPORATION, WRIGHT MEDICAL TECHNOLOGY, INC.,**
*Appellants*

**v.**

**OSTEOMED LLC,**
*Cross-Appellant*

---

2023-1925, 2023-1926, 2023-1928, 2023-1929, 2023-1979

---

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2021-01450, IPR2021-01451, IPR2021-01452, IPR2021-01453.

-------------------------------------------------

**STRYKER CORPORATION, WRIGHT MEDICAL TECHNOLOGY, INC.,**
*Appellants*

**v.**

**OSTEOMED LLC,**
*Appellee*

---

2023-2010, 2023-2011, 2023-2012

———————————

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2022-00189, IPR2022-00190, IPR2022-00191.

———————————

Decided: October 3, 2025

———————————

SHARON A. HWANG, McAndrews, Held & Malloy, Ltd., Chicago, IL, argued for appellants. Also represented by SCOTT P. MCBRIDE, SEAN SPARROW, I, ROBERT A. SURRETTE.

DEVON C. BEANE, Alston & Bird LLP, Chicago, IL, argued for cross-appellant. Also represented by JASON A. ENGEL, K&L Gates LLP, Chicago, IL.

———————————

Before HUGHES, BRYSON, and STARK, *Circuit Judges.*

HUGHES, *Circuit Judge.*

This appeal arises from a series of IPRs challenging four related patents owned by OsteoMed, each of which claims a system for securing bones together across a joint using bone plates. The Patent Trial and Appeal Board found some of the challenged claims patentable and others unpatentable. Stryker challenges holdings of patentability in its appeal; OsteoMed challenges holdings of unpatentability in its cross-appeal. Regarding Stryker's appeal, we conclude that substantial evidence does not support the Board's finding that the Slater reference did not anticipate the independent claims, reverse the Board's finding of anticipation as to the independent claims, and vacate and remand for further proceedings to evaluate whether the dependent claims are similarly anticipated by the cited prior art grounds. Regarding OsteoMed's cross-appeal,

because we agree with the Board's relevant claim constructions, we affirm.

I

This appeal concerns a set of four patents—U.S. Patent Nos. 8,529,608; 9,351,776; 9,763,716; and 10,245,085 (Challenged Patents)—which share a specification[1] and claim a system for securing bones together across a joint after a joint fusion surgery, including a bone plate with a transfixation screw hole and a transfixation screw that can be installed on the compression side of a joint while limiting opening of the joint on the tension side.

Joint fusion is a surgical treatment option when trauma to a joint or joint erosion causing cartilage wear leads to painful motion. To achieve fusion, bone plates secured by screws are used to hold the bones in alignment and temporarily restrict use of the joint while it heals. *See* J.A. 415 (1:12-18).

Each of the Challenged Patents' claims recite a transfixation screw configured to extend through the bone. This configuration is especially important for use of the claimed bone plates in the human foot because, while walking, the bottom of the foot is in tension, and the Challenged Patents claim absorbing this tensile load away from the joint bones through the transfixation screw inserted into the bone plate to increase stability and the chance of bone fusion. J.A. 3509 (¶ 44).

The claimed system achieves this result using the lag compression surgical technique, which is designed to create and maintain compression across the area where the bone

---

[1]    Following the Appellant's Opening Brief, we cite to the '608 patent when discussing the specification, which is identical to the other patents' specifications other than the claims. Appellant's Opening Br. 5 n.2.

needs to heal to stabilize the area. Lag compression typically requires a specialized screw that is partially threaded[2] only on the end furthest from the screw head to draw the second bone, that is, the one further from the screw head closer to the first, nearer bone across the joint. As a result, typically only the second bone through which the screw passes is threadably engaged to the transfixation screw; the first bone typically interfaces with the smooth portion of the screw and is slidably engaged with the screw. J.A. 417–18 (6:64–7:12). The patents alternatively disclose that, if the screw is threaded along its entire shaft, a larger pilot hole can be drilled into the first bone to avoid threaded engagement of the screw with the first hole. J.A. 418 (7:12–17). In both instances, when the screw is advanced into the second bone via threaded engagement, it draws the second bone toward the first bone, compressing the joint—this results in what is called the "lag effect." J.A. 415 (2:26–37). The presence of the screw across the joint and its lag effect are purported "technical advantages" that may "increase the contact pressure on the bony interface of the joint, increasing the probability of a positive fusion." J.A. 415 (2:37–41).

The claimed bone plate also includes a spine and bridge portion that spans across the joint. The Challenged Patents further provide that the bridge portion of the plate may be thicker than other portions of the plate to better absorb the tensile load that the transfixation screw absorbs from the second bone without undermining the integrity of the plate (i.e., to prevent the plate from bending or breaking). J.A. 418 (8:7–11), J.A. 420 (cl. 1). The claimed plate has a spine with three portions: a first end, a second end, and a bridge

---

[2] Threading refers to the spiral pattern winding around the surface of a screw that allows the screw to better anchor itself with respect to the material with which the screw engages.

portion that spans across the joint. The plate in some embodiments has a hole at a fixed angle relative to the plate designed to direct the screw trajectory to cross the neutral bending axis of the joint, which allows for absorption of tension force from the joint. J.A. 417 (6:12–18).

The claims of the '608, '776, and '716 patents are materially identical. *See* Appellant's Opening Br. 11. Independent claim 11 of the '608 patent is representative and recites:

> 11. A plate for securing two discrete bones together across an intermediate joint, comprising:
>
>     . . .
>
> a transfixation screw hole disposed along the spine, the transfixation screw hole comprising an inner surface configured to direct a transfixation screw through the transfixation screw hole such that the transfixation screw extends alongside the bridge portion at a trajectory configured to pass through a first position on the first bone and a second position on the second bone once the plate is placed across the joint, enabling **[Tensile Transfer Limitation]** *said screw to absorb tensile load when the second bone is loaded permitting transfer of the tensile load through said screw into said bridge*, wherein at least a portion of said bridge portion and said transfixation screw hole has a thickness greater than at least a portion of said first and second ends.

J.A. 421 (cl. 11) (emphasis added).[3]

---

[3]    The Tensile Transfer Limitations are recited in claims 1 and 11 of the '608 patent, claims 1 and 10 of the '776 patent and claims 1, 10, and 16 of the '716 patent. J.A. 435–36; 448–49.

The '085 patent has similar claim language to the other patents but does not include the Tensile Transfer Limitations. Claim 1 recites:

> 1. A system for securing a first discrete bone and a second discrete bone together across a joint between the first discrete bone and the second discrete bone, the system comprising:
>
> a plate comprising:
>
> > . . .
> >
> > an aperture defining **[Bridge Limitation]** *a transfixation screw hole disposed along the spine at the thickened portion of the bridge portion*, the transfixation screw hole comprising an inner surface configured to direct a transfixation screw through the transfixation screw hole such that the transfixation screw extends at a trajectory configured to pass through a first position on the first discrete bone and a second position on the second discrete bone once the plate is placed across the joint.

J.A. 462 (cl. 1) (emphasis added). Dependent claim 8 of the '085 patent further recites:

> 8. The system of claim 1, wherein:
>
> *a central axis of the inner surface of the transfixation screw hole defines the trajectory*; and
>
> *the trajectory is configured to cross a neutral bending axis* of the joint once the plate is placed across the joint.

J.A. 463 (cl. 8) (emphasis added).

IPR Nos. 2021-01450, 2021-01451, 2021-01452, concerned the '608, '776, and '716, patents respectively. The petitions for each IPR cited the same six grounds:

(1) Anticipation by Slater; (2) Obviousness over Slater in view of Weaver; (3) Anticipation by Falkner; (4) Obviousness over Falkner in view of Arnould; (5) Obviousness over Arnould in View of Slater; and (6) Obviousness over Arnould and Weaver.

IPR No. 2021-01453 concerned the '085 patent and the petition cited nearly the same grounds as those referenced above, with the exception to the sixth ground: "Obviousness over Arnould in view of Slater and Weaver." A second set of petitions (IPR Nos. 2022-00189, 2022-00190, 2022-00191) challenged dependent claims 15, 16, and 21 of the '608, '716, and '776 Patents relying on two grounds: (1) Anticipation by Slater and (2) Obviousness over Falkner in view of Duncan.

The relevant issues on appeal that we address in this opinion concern the Slater reference. Slater, WO 2007/131287, is entitled "Ankle Fusion Plate" and is directed to a bone plate for immobilizing a joint by fusion of the adjacent bones in the ankle. J.A. 2491. The Slater bone plate includes openings configured to allow a fixation screw to pass through it and attach to various bones, allowing for varying angles of advancing the fixation screw through the plate. Depending on the orientation of the transfixation screw, the Slater plate may be used to fuse one joint (where the screw runs through the tibia and anchors to the talus bone) or two joints (where the screw runs through the tibia and talus before anchoring in the calcaneus bone). J.A. 2499–508 (8:27–29, 11:19–23, 12:3–5, 16:28–30, 17:3–5, 16:6–9), J.A. 2918 (¶ 122). Slater further teaches that portion 20 of its plate includes a slotted opening 26 and formation 27 configured to allow a screw 25 to be implanted at an angle within a predetermined angular range, where the surgeon chooses the particular orientation and required angle depending on the joints so as to achieve maximum compression of the fusion sites. J.A. 2502–03 (11:19–22, 12:3–5); *see also* J.A. 3512–13 (¶ 56); J.A. 2515 (24:4–

8). Figure 1 of Slater shows an exemplary pathway through the opening in which screw 25 engages only the tibia 4 and talus 3 bones (to fuse the tibiotalar joint) and two exemplary pathways through the opening in which screw 25 engages the tibia 4, talus 3, and calcaneus 28 bones (to fuse both the tibiotalar joint and the subtalar (talocalcaneal) joint). J.A. 2519. Slater also discloses that another embodiment of its screw, shown in Figure 4, is "adapted for insertion in the plate of figures 1 and 2 . . . [It] has a longer shank to increase depth of penetration and ***has an abbreviated threaded portion to allow the majority of the shank to slide through aligned tibial and talus screw holes finally anchoring in the calcaneus bone***." J.A. 2503–04 (12:32–13:3) (emphasis added).



FIGURE 1

J.A. 2519.

In its final written decisions, the Board concluded that Stryker failed to demonstrate anticipation or obviousness of the Tensile Transfer Limitations in all challenged claims of the '608, '776, and '716 patents. J.A. 25, 82, 144. With respect to the '085 patent, the Board held claims 1–7 unpatentable, but further concluded that claims 8–9, which include the Central Axis Limitation, were patentable. J.A. 177.

Stryker timely appealed, and OsteoMed timely cross-appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A).

## II

We review the Board's claim constructions *de novo* and its underlying factual determinations for substantial evidence. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). "Board findings establishing the scope of the patented subject matter may fall within the ambit of claim construction." *HTC Corp. v. Cellular Commc'ns Equip., LLC*, 877 F.3d 1361, 1367 (Fed. Cir. 2017).

"Anticipation is a question of fact reviewed for substantial evidence." *In re Rambus, Inc.*, 753 F.3d 1253, 1256 (Fed. Cir. 2014). To anticipate a claim under 35 U.S.C. § 102, a prior art reference "must not only disclose all elements of the claim within the four corners of the document, but must also disclose those elements arranged as in the claim." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008) (internal citation and quotation marks omitted). The Board's ultimate determination of obviousness is a question of law reviewed *de novo*, with associated factual findings reviewed for substantial evidence. *Uber Techs., Inc. v. X One, Inc.*, 957 F.3d 1334, 1337 (Fed. Cir. 2020).

"The substantial evidence standard asks 'whether a reasonable fact finder could have arrived at the agency's decision,' and 'involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision.'" *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1381–82 (Fed. Cir. 2019) (quoting *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000)).

## III

Stryker challenges the Board's findings that Slater did not anticipate the Tensile Transfer Limitations of the '608,

'776, and '716 patents and the Central Axis Limitation of the '085 patent. We address each in turn.

A

In its final written decision regarding the '608 patent, the Board found Stryker "ha[d] not established that Slater expressly or inherently discloses the transfer of tensile load limitations in claims 1 and 11 and therefore [did] not prove, by a preponderance of the evidence, that Slater anticipates either of claim 1 or 11." J.A. 25.[4] This finding was predicated on the Board's view that Slater does not disclose a "vise configuration," because Slater does not "disclose how its lag screw threads interact with the first and second bone," and "does not state that the screw only engages in the [terminal] bone." J.A. 22. This reasoning was the Board's sole basis for finding the challenged independent claims of the '608, '776, and '716 patents were not anticipated by Slater nor rendered obvious by Slater in view of Weaver. J.A. 21–27, 78–83, 140–45. Stryker contends this holding should be reversed because the Board's finding that Slater did not anticipate the Tensile Transfer Limitations is unsupported by substantial evidence. We agree.

The '608, '776, and '716 patent claims specify that the transfer of tensile load from the second bone through the screw into the bridge portion of the bone plate occurs "when

---

[4]    OsteoMed argues that Stryker "did not advance an inherency argument below and have waived such an argument on appeal." OsteoMed Resp. Br. at 22. We disagree. Not only did the Board consider inherency, *see* J.A. 25; *see also* J.A. 21 ("The parties dispute whether Slater expressly or inherently disclose[s] these limitations."), it did so because this argument was adequately presented in Stryker's petition. *See* J.A. 521-22; *see also* J.A. 1107, 1121-24 (Stryker raising these arguments in reply brief before the Board).

the second discrete bone is loaded." J.A. 420–21 (12:28–31, 13:28–31). The shared specification explains that the nature of the claimed transfixation screw and the way it is screwed across the joint is what causes the transfer of tensile forces:

> [W]hen transfixation screw 150 is screwed across joint 106 such that the head 152 of transfixation screw 150 abuts the inner surface of transfixation screw hole 102, the portion of transfixation screw 150 engaged with bone 104*b* [the second bone] will pull against the head 152 of transfixation screw 150 when a load is applied to joint 106. Since the head of transfixation screw 150 is braced against the inner surface of transfixation screw hole 102, it will absorb the tension forces transmitted up the shaft of transfixation screw 150 . . . .

J.A. 417 (5:60–6:3). The specification further provides that when the transfixation screw is a lag screw, it will tighten the interface between the joint. J.A. 417 (6:50–58). The patents' specifications never explicitly explain *how* the tensile load is transferred from the second bone to the bridge portion of the bone plate through the screw. *See* Appellant's Opening Br. 25.

The Board rejected Stryker's argument that tensile load was necessarily transferred to the bridge portion of the bone plate when the transfixation screw is inserted across the joint and the head of the transfixation screw abuts the bone plate, explaining that Slater could only meet the claimed "transfer of tensile load" language if its lag screw included threads that interact with the bones in a particular way; namely, engaging only the second bone with no threads engaging any part of the first bone. J.A. 22–23. The Board admitted that Slater teaches, in a three-bone joint, that "a second screw type 70" having "a longer shank to increase depth of penetration and has an abbreviated threaded portion to allow the majority of the shank to

slide through aligned tibial and talus screw holes finally anchoring in the calcaneus bone." J.A. 22 (quoting Slater, 12:32–13:3). It noted that this description "does not state that the screw *only* engages the third bone, the calcaneus bone, and describes the 'majority of the shank' as 'slid[ing] through' holes in the first two bones without stating that none of the threads engage a portion of, for example, the end of the second bone adjacent the third bone." J.A. 22 (alteration in original). But no reasonable factfinder could find that a skilled artisan would read "sliding" a screw through a hole to suggest that the screw is threadably engaged with the hole that it slides through. The Board's finding to the contrary lacks substantial evidence.

The Board also took an overly narrow view of anticipation inconsistent with our caselaw to conclude that Slater's disclosures regarding its three-bone embodiment were inapplicable to its two-bone embodiment.[5] The Board concluded that "even if . . . Slater describes a *three*-bone embodiment where the threads only engage the third bone,

---

[5] Stryker characterizes the Board's decision as crediting OsteoMed's argument that Slater's disclosed lag screw does not necessarily achieve the lag effect, *see* Appellant's Opening Br. 33–34; however, we do not read the Board's decision as saying that. Rather, its analysis seems to hinge on the fact that Stryker's cited disclosures discuss the three-bone embodiment of Slater. *See* J.A. 22–24.

We recognize that the Board found OsteoMed's expert's testimony "more credible and persuasive" than the testimony of Stryker's expert. J.A. 81. The Board stated that the basis for this finding was the experts' competing readings of Slater. J.A. 81 ("We view the testimony of Mr. Sommers as more credible because it more accurately tracks Slater's disclosures."). For all the reasons we have explained, however, the Board's reading of Slater is not supported by substantial evidence.

Slater provides insufficient support for [Stryker's] position that the threads of screw type 70 only engage the second bone in Slater's *two*-bone embodiment." J.A. 22. Notably, this analysis is inconsistent with the Board's analysis of Slater in the IPR concerning the '085 patent. In its Final Written Decision concerning the '085 patent, the Board indicated that "any discussion" regarding the plate shown in Slater Figure 1 "should be read as part of the two-bone embodiment [that Stryker] relies on as well as the three-bone embodiment," J.A. 196, while for the other three challenged patents the Board declined to consider Slater's disclosures made regarding its three-bone embodiment as applicable to the two-bone embodiment, J.A. 22–23, 79–80, 141–42. Indeed, in the final written decision for the '085 patent, the Board noted that "[t]he two-bone embodiment appears to be an 'alternate' embodiment only insofar as it reflects another angled pathway for the screw so it anchors in a second and not a third bone" and "both the two-bone and three-bone embodiments are depicted as alternatives within the plate of Figure 1 itself." Appellant's Opening Br. 37–38 (alteration in original) (quoting J.A. 196).

OsteoMed cites *Net MoneyIN, Inc. v. VeriSign, Inc.,* 545 F.3d 1359, 1369 (Fed. Cir. 2008) for the proposition that an anticipatory reference must disclose elements "arranged as in the claim" to favor affirmance. Appellee's Opening Br. 1. However, we have distinguished *Net MoneyIN* from cases where, as here, "[the prior art] explicitly contemplates the combination of the disclosed functionalities" and "expert testimony . . . support[s] [a] factual determination that one of skill in the art would read the reference as disclosing the ability to combine the tools to arrive at the invention recited in the . . . Patents." *See Blue Calypso, LLC v. Groupon, Inc.,* 815 F.3d 1331, 1343 (Fed. Cir. 2016).

Here, the Board does not point to a reason that Slater's disclosures regarding the three-bone embodiment would not apply to the two-bone embodiment, since Slater

14                    STRYKER CORPORATION v. OSTEOMED LLC

discloses that the screw would be used—albeit in different lengths—to "allow for particular insertion points and specific characteristics (e.g. bone density) of [the] bone[s] at points of fixation." J.A. 2507 (16:30–32). The Board's own statements in the '085 patent IPR proceeding establish why disclosures regarding the three-bone embodiment should be read to apply equally to the two-bone embodiment. This case, then, like *Blue Calypso*, 815 F.3d at 1343, "is more akin to our decision in *Kennametal*[*, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015) (internal quotation marks and alterations omitted)], where we recognized that a reference can anticipate a claim even if it does not expressly spell out all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would at once envisage the claimed arrangement or combination." The Board thus lacked substantial evidence support in concluding that the disclosures made about Slater's three-bone embodiment did not apply to the two-bone embodiment as well.

OsteoMed's efforts to characterize Stryker's ground as relying on a "mix-and-match of Slater's various embodiments and disclosures," Appellee's Opening Br. 28, is both misleading and inconsistent with our precedent, which clearly states that anticipation may still be found by disparate disclosures in the same reference where the reference explicitly contemplates combining those disclosures. *See Blue Calypso*, 815 F.3d at 1341 ("[A] reference can anticipate a claim even if it does not expressly spell out all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would at once envisage the claimed arrangement or combination." (cleaned up)).

The Board thus did not have substantial evidence support for its conclusion that Slater does not anticipate the Tensile Transfer Limitations. We accordingly reverse the Board's holding that the independent claims of the '608, '776, and '716 were not anticipated by Slater and vacate

and remand the Board's determinations regarding anticipation or obviousness of the dependent claims for reconsideration consistent with this opinion.

## B

Stryker next challenges the Board's finding that the Central Axis Limitations of claims 8 and 9 of the '085 patent were not anticipated by Slater. The Board found Slater's disclosure of a transfixation screw hole through which the transfixation screws may be positioned at different angles "lacks a central axis that *defines* a screw directory [sic, trajectory] as the claim requires." J.A. 215. We hold that this determination of fact was supported by substantial evidence.

Dependent claim 8 recites "a central axis of the inner surface of the transfixation screw hole defines *the trajectory*; and the trajectory is configured to cross a neutral bending axis of the joint once the plate is placed across the joint." J.A. 463 (cl.8) (emphasis added). This claim thus limits the trajectory of the screw claimed in claim 1, J.A. 462 (cl. 1), as being defined by the central axis of the screw hole in the bone plate and being configured to cross a neutral bending axis of the joint once the plate is placed across the joint. However, the Board explained that "Slater knew how to describe other holes as having a fixed angle but deliberately described transfixation hole 26 using different language, making clear that '[o]pening 26 is meant to be a variable angle hole.'" J.A. 215 (alteration in original). This provides substantial evidence support for the Board's conclusion that "[w]ithout any predetermined angle, hole 26 lacks a central axis that *defines* a screw directory as the claim requires." J.A. 215. The Board explained why it did not credit Stryker's expert testimony that the oblique hole has a central axis that may define one of the possible screw trajectories, since the very nature of this hole is that it accommodates various angles such that the hole is not defining a single trajectory. *See* J.A. 215–16.

16                STRYKER CORPORATION v. OSTEOMED LLC

IV

In its cross-appeal, OsteoMed challenges two findings of the Board related to the Bridge Limitation. Specifically, OsteoMed contends the Board erred by (1) finding the limitation that the hole be located "at" the bridge portion does not encompass the hole being "adjacent to" the bridge portion in view of the specification of the '085 Patent, and (2) ignoring that the claim limitation is "at the thickened portion of the bridge portion" and not "at the bridge portion." Appellee's Opening Br. 4. These are essentially challenges to the Board's claim constructions and fail as they are inconsistent with the plain reading of the claim terms in view of the patent specification.

OsteoMed argues that the Board erred in construing the limitation "'at the bridge portion' as at least encompassing a hole *adjacent to* the bridge portion as the specification describes." Appellee's Opening Br. 4 (quoting J.A. 205). But in that same paragraph, the Board states "the '085 patent explains that the transfixation screw hole 'may be included in thickened section 136, adjacent to bridge portion 130.'" J.A. 205 (quoting J.A. 460, 9:6–8). It elaborates that "[t]he specification . . . undermines any reading of 'at the bridge portion' to mean that the hole must be part of the bridge portion because the specification describes the bridge portion as free of voids and holes." J.A. 205–06 (quoting J.A. 460, 8:32–41, 8:60–9:8). Indeed, the '085 patent specifically states that the bridge portion is "typically defined by an unbroken section of spine 124 that is free of voids such as positioning holes or screw holes that could potentially reduce the bending strength of bridge portion 130. Depending upon design, bridge portion 130 may include a thickened section 136 of bone plate 100" and that "[a]s an example . . . , transfixation screw hole 102 may be disposed along the center line 138 of spine 124, immediately adjacent to bridge portion 130." J.A. 460, 8:32–41, 8:60–9:8. This is sufficient support to find the Board did not err in its construction, since the specification clearly provides that

the bridge portion is devoid of holes, and the thickened section of bone plate is part of the bridge portion. OsteoMed's arguments to the contrary do not explain why the Board was wrong to credit explicit disclosures in the specification. The Board's findings regarding the Central Axis Limitation are supported by substantial evidence.

## V

We have considered the parties' remaining arguments and find them unpersuasive.[6] Regarding the '608, '776, and '716 patents, we accordingly reverse the Board's holding that Slater does not anticipate the challenged independent claims and vacate and remand for further proceedings to evaluate whether the challenged dependent claims are similarly anticipated or rendered obvious by the cited prior art grounds in view of the analysis provided in this opinion. Regarding the '085 patent, we affirm the Board's finding that claims 1–7 are unpatentable as anticipated by Slater and that claims 8–9 are not anticipated by Slater.

**AFFIRMED-IN-PART, VACATED AND REMANDED-IN-PART, REVERSED-IN-PART**

COSTS

Costs are awarded to Appellants.

---

[6]    Stryker also appealed the Board's conclusion that it failed to demonstrate anticipation or obviousness for claims 1-6, 8-14, 16 and 17 of the '608 patent, 1-6, 8-13, and 15 of the '776 patent, claims 1-6, 8-13, 15-19, and 21 of the '716 patent, and claims 8-9 of the '085 patent in view of *Falkner,* et al, but we find no reversible error in the Board's determinations on those grounds.